896 F.Supp. 851 (1995)
ELI LILLY AND COMPANY, Plaintiff,
v.
AMERICAN CYANAMID COMPANY, Biocraft Laboratories, Inc., Zenith Laboratories, Inc., and Biochimica Opos, S.p.A., Defendants.
No. IP 95-536C B/S.
United States District Court, S.D. Indiana, Indianapolis Division.
August 4, 1995.
As Corrected August 25, 1995.
*852 John R. Schaibley, III, Nancy G. Bollinger, Baker & Daniels, Indianapolis, IN, Paul H. Berghoff, Jon O. Nelson, Edward W. Remus, James C. Gumina, Banner & Allegretti, Ltd., Chicago, IL, for plaintiff.
Jay G. Taylor, Ice Miller Donadio & Ryan, Indianapolis, IN, Hugh E. Reynolds, Jr., Locke Reynolds Boyd & Weisell, Indianapolis, IN, Stephen E. Arthur, Ronald E. Elberger, Bose McKinney & Evans, Indianapolis, IN, Henry J. Price, Price & Barker, Indianapolis, IN, Robert L. Baechtold, Thomas H. Beck, Fitzpatrick, Cella, Harper & Scinto, New York City, James Galbraith, Maria Luis Palmese, Kenyon & Kenyon, New York City, Arnold H. Krumholz, William L. Mentlik, Roy H. Wepner, Lerner David Littenberg Krumholz & Mentlik, Westfield, NJ, Marc S. Gross, Arthur Mann, Robert E. Hanlon, Bryan Cave, New York City, Jay B. Shapiro, Associate Gen. Counsel, IVAX Corp., Miami, FL, for defendants.

ENTRY
BARKER, Chief Judge.
This matter is presently before the Court on plaintiff Eli Lilly and Company's ("Lilly") motion seeking a preliminary injunction. For the reasons set forth below, the Court denies the motion.

I. FACTUAL BACKGROUND.
This is an action for patent infringement against three New Jersey drug companies  American Cyanamid Co. ("Cyanamid"), Zenith Laboratories, Inc. ("Zenith") and Biocraft Laboratories, Inc. ("Biocraft")  who have been sued in connection with their importation and sale of a drug known as cefaclor, and the Italian drug company  Biochimica Opos, S.p.A. ("Opos")  which manufactures and supplies bulk cefaclor to them. Plaintiff Lilly is a corporation engaged in the business of researching, developing, manufacturing and selling prescription pharmaceutical products. Defendant Cyanamid, a subsidiary of American Home Products Corporation, markets generic pharmaceutical products through its Lederle division.[1] Defendants Zenith, a subsidiary of the IVAX Corporation, and Biocraft are also is in the business of manufacturing and marketing generic pharmaceutical products. Defendant Opos is organized under the laws of the country of Italy. Opos is a wholly owned subsidiary of Roussel UCLAF and is in the business of manufacturing pharmaceutical products for generic drug companies.
*853 The patent in suit describes a method for manufacturing a compound used in synthesizing an antibiotic known as cefaclor. Cefaclor, which is currently one of the largest selling antibiotics in the United States, is the generic name of a broad-spectrum antibiotic sold by Lilly under the branded name Ceclor®. Mr. Robert Chauvette, a Lilly scientist, first discovered and synthesized cefaclor in the early 1970's. Cefaclor was subsequently patented by Lilly in 1975 and has been exclusively marketed by it since 1979. Lilly's patent on cefaclor, U.S. Patent No. 3,925,372 ("the '372 patent"), expired on December 9, 1992.
Cefaclor is a complex molecule that is derived from forms of penicillin. It is a member of the general class of cephalosporin antibiotics, all of which have as a common core the so-called "cephalosporin" or "cephem nucleus." There are hundreds or thousands of cephalosporin compounds, all of which differ from one another by the presence of different atom groups at the so-called 3-, 4- and 7-positions on the cephalosporin nucleus. Nevertheless, only a few such compounds have any utility as antibiotic drugs and only a handful of those have been commercially marketed.
There are at least two different process routes for making cefaclor. A process used by Lilly ("the Lilly process") represents one of those routes. In the Lilly process, an intermediate compound known as exomethylene is converted into a compound referred to as the enol cephem.[2] This enol cephem intermediate is then chlorinated and subjected to several processing steps in order to create cefaclor. Lilly has subsequently obtained at least three patents describing different aspects of this process; in addition to the '372 patent, which described Lilly's rights in the cefaclor molecule per se, Lilly obtained U.S. Patent Nos. 3,917,587 and 4,064,343, which claimed intermediate compounds used to make cefaclor. By the end of 1994, however, all of these patents had expired.
The patent involved in this case, U.S. Patent No. 4,160,085 ("the '085 patent" or "the Shionogi process"),[3] signifies a second route for making cefaclor. At one time, the '085 patent rights were held by Shionogi & Co., Ltd., of Osaka, Japan. Lilly is the current owner of the patent, however, having purchased it from Shionogi on April 27, 1995, the date this lawsuit was filed. Neither Lilly nor Shionogi has utilized the processes claimed in the '085 patent to manufacture cefaclor for commercial sale in the United States or anywhere else. The seventeen year term of the '085 patent will expire on July 3, 1996.
Opos manufactures bulk cefaclor in a nine-step process with a starting material "compound 1," eight chemically distinct intermediates (compounds 2-9), and a final end product (cefaclor). Claim 5 of the '085 patent purports to cover the part of Opos' process which converts intermediate compound 5 into compound 6 ("step 5"). Both claim 5 of the '085 patent and step 5 of the Opos process describe a cyclization reaction whereby a non-cephem compound is transformed into an enol cephem, which is a cephalosporin intermediate that is useful in creating a variety of cephem antibiotic substances.
Once compound 6 is created, it is then subjected to four sequential process steps in order to convert it to cefaclor. First, the hydroxy (OH) group is removed from the 3-position and is replaced with chlorine (Cl). It is the addition of this chlorine atom that distinguishes cefaclor from a related antibiotic cephalosporin known as cephalexin. Second, the resulting compound (compound 7) is subjected to a reaction to remove the phenylacetyl side chain from the 7-position group, creating compound 8. Lilly's patent on compound 8, U.S. Patent 4,064,343, expired on December 20, 1994. From there, a phenylglycine side chain is added to create compound 9. Finally, the p-nitrobenzyl protecting group is removed from the 4-position, thus creating cefaclor.
In June, 1994, Lilly established STC Pharmaceuticals, Incorporated ("STC") to market *854 generic pharmaceutical products. STC is a wholly owned subsidiary of Lilly, having a principal place of business at Lilly Corporate Center, Indianapolis, Indiana. In October of 1994, STC concluded agreements with Mylan Pharmaceuticals, Incorporated ("Mylan") whereby Mylan would market cefaclor products manufactured by Lilly. By April 27, 1995, the Mylan/Lilly generic cefaclor product comprised about two-thirds of Lilly's domestic cefaclor sales.
On April 27, 1995, Zenith and Cyanamid obtained approval from the Food and Drug Administration ("FDA") to sell generic cefaclor in the United States. Both Zenith and Cyanamid are currently selling cefaclor in the United States. Biocraft has also applied for FDA approval to manufacture dosage forms of cefaclor and to sell those dosage forms in the U.S., but has not yet obtained such approval. All three have purchased bulk cefaclor through the Roussel Corporation, which in turn obtains bulk cefaclor from Opos.
On April 27, 1995, Lilly filed this action, seeking inter alia (1) a declaration that the domestic defendants' importation of cefaclor manufactured by Opos infringes the Lilly/Shionogi patents, and (2) a preliminary injunction enjoining the defendants from importing or inducing the importation of cefaclor manufactured by Opos into the United States. On July 17-19, 1995, the Court conducted a three-day evidentiary hearing on Plaintiff's motion for preliminary injunction, at which a number of witnesses testified and hundreds of exhibits were entered into the record. On the basis of this record, the Court now denies Plaintiff's motion for preliminary injunction.

II. PRELIMINARY INJUNCTION STANDARDS.
Injunctive relief in patent cases is authorized by 35 U.S.C. § 283. Whether a preliminary injunction should issue turns on four factors:
(1) the movant's reasonable likelihood of success on the merits;
(2) the irreparable harm the movant will suffer if preliminary relief is not granted;
(3) the balance of hardships tipping in the movant's favor; and
(4) the impact of the injunction on the public interest.
Reebok Int'l Ltd. v. Baker, 32 F.3d 1552, 1555 (Fed.Cir.1994); Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 (Fed.Cir. 1988). The burden is always on the movant to show entitlement to a preliminary injunction, the issuance of which is a matter of discretion for a district court. Intel Corp. v. ULSI System Technology, Inc., 995 F.2d 1566, 1568 (Fed.Cir.1993). The Federal Circuit has cautioned, however, that "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." Id.

A. Likelihood of Success on the Merits
In a patent infringement case, a reasonable likelihood of success requires a showing of (1) validity and (2) infringement of the patents. Reebok, 32 F.3d at 1555.

(1) Validity
Generally, the party asserting invalidity bears the burden of persuasion and must establish by clear and convincing evidence a prima facie case of invalidity before the patent holder will be required to come forward with evidence to the contrary. Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461 (Fed.Cir.1988); 35 U.S.C. § 282 (1984). At the preliminary injunction stage, however, the patentee carries the burden of showing a likelihood of success on the merits of the substantive issues relating to validity and enforceability of patents. Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed.Cir. 1991). Therefore, the patentee must either clearly show that his patent is valid, Nutrition 21, 930 F.2d at 870 (quoting Atlas Powder Co. v. Ireco Chemicals, 773 F.2d 1230, 1233 (Fed.Cir.1985)), or conversely, that the alleged infringer's invalidity defense lacks substantial merit. New England Braiding Co. v. A. W. Chesterton Co., 970 F.2d 878, 883 (Fed.Cir.1992); RasterOps v. Radius, Inc., 861 F.Supp. 1479, 1490 (N.D.Cal.1994).
Here, the accelerated pace of this suit has abbreviated the amount of time available *855 to the defendants to conduct discovery concerning Shionogi's work leading to the creation of the '085 patent. As a result, the defendants have been unable to advance any of the usual invalidity defenses based on obviousness, anticipation or definiteness. Nevertheless, the burden falls on plaintiff to establish a likelihood of ultimately succeeding on this element at trial. Toward that end, Lilly presented the testimony of Professor Corey, a Nobel laureate in chemistry from Harvard University. Professor Corey testified that the invention described in claim 5 of the '085 patent would not have been obvious to a person of ordinary skill in the art, which he defined as a person "having training to the Ph.D. level in synthetic chemistry at a good institution" and who has one or more years of experience working with cephalosporins. (Test. of Professor Corey, Transcript at 58). Dr. Lowell Hatfield, a high-ranking Lilly scientist, and Professor Jack Baldwin, a distinguished scientist at Oxford University, agreed. Indeed, Professor Baldwin testified that the process of claim 5 "seemed to go against the grain of what me and a lot of other people at Lilly had been thinking about the way to make the enol cephem." (Test. of Professor Baldwin, Transcript at 170). Thus, because there is sufficient evidence from which to conclude that the prior art neither teaches claim 5 nor raises any questions as to its validity, we find that this element has been satisfied for purposes of this motion.

(2). Infringement
Historically, owners of process patents had remedies for the unauthorized use of their processes only if the patented process was used in the United States. As a result, a manufacturer could avoid infringement liability by simply using a patented process in a foreign country and then shipping the product to this country for sale. See H.R.Rep. No. 60, 100th Cong., 1st Sess. 5 (1987); Glenn Law, Note, Liability Under the Process Patent Amendments Act of 1988, 60 Geo. Wash. L.Rev. 245 (1991).[4] However, with the enactment of 35 U.S.C. § 271(g), referred to as the Process Patents Amendment Act, Congress endeavored to provide "meaningful protection to owners of patented processes" by making it unlawful to import goods made abroad pursuant to a patented process. (H.R.Rep. No. 60 at p. 5). Section 271(g) reads in pertinent part:
Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent.
35 U.S.C. § 271(g) (1995 Supp.).
Not every foreign-manufactured product subject to a U.S. process patent, however, falls within the Act's purview. Indeed, in section 271(g), Congress provided two important limitations on the Act's application:
A product which is made by a patented process will, for purposes of this title, not be considered to be so made after 
(1) it is materially changed by subsequent processes; or
(2) it becomes a trivial and nonessential component of another product.
35 U.S.C. § 271(g) (emphasis added). By including this language, Congress directed "the courts to exercise careful judgement in distinguishing those products that are too far removed from the patented process ... [from] those that have been changed only in insignificant ways." (Senate Rep. No. 83, 100th Cong., 1st Sess. 70 (1987)). Thus, when read as a whole, the two parts of section 271(g) require the plaintiff to demonstrate (1) that a product is produced pursuant to a patented process, (2) that the product is then imported into this country, and (3) that the product made by the patented process *856 is neither materially changed by subsequent processes nor a trivial and nonessential component of another product.
In this case, there is little dispute among the parties that the first two prongs of section 271(g) are satisfied. First, for purposes of this motion, it is uncontested that claim 5 of the '085 patent describes step 5 of the Opos process. Not only was there general agreement to that effect among the several expert witnesses who testified at the hearing, see Corey Test., Transcript at 56-57; Test. of Dr. Marvin Gorman, Transcript at 404-05, but the litigants have so stipulated. (Stipulation No. 40). Nor do the defendants in any way contest whether cefaclor is in fact imported into this country. Indeed, the evidence presented at the hearing showed that Zenith and Cyanamid began selling their generic cefaclor products in the United States almost immediately after they obtained approval in April of 1995 from the Food and Drug Administration. See, e.g., Test. of John H. Klein, Transcript at 486; Test. of John R. Tupman, Transcript at 205; Stipulation No. 42.
Thus, this dispute boils down to whether "a product which is made by a patented process [i.e. compound 6] ... is materially changed by subsequent processes." To answer that question, the court must determine whether steps 6, 7, 8 and 9 of the Opos process materially change compound 6. Or, to put it another way, whether the end product of cefaclor represents a material change to intermediate compound 6.
Although easy to ask, the question of whether an end product is sufficiently removed from a patented process to avoid infringement liability is surprisingly difficult to answer. The easy case is where the product which results from the patented process is imported in that same form after manufacture. In that situation, the "materially changed" defense is not implicated:
If the patented process produced chemical X, anyone importing, using, or selling chemical X made by that process is liable for infringement.
(H.R.Rep. No. 60, at p. 20). In this case, it is undisputed that none of the defendants has imported, offered to sell or use compound 6 within the United States. As a result, the easy case is not presented here.
Congress, however, intended that "the scope of this law reach[] beyond the easy case or fact situation." (H.R.Rep. No. 60, at p. 20). Indeed, in some circumstances, infringement liability will lie even though the imported product is subjected to further processing steps that alter its appearance or structure. For example, infringement liability is not avoided when a new entity, chemical Y, is produced from chemical X and "the only way to have arrived at Y is to have used the patented process at some step, e.g., producing X as an intermediate." (S.Rep. No. 83, at p. 71). Nor are mere processing steps that change only the shape, size or form of the product material changes:
[I]f chemical X was the active ingredient of a pharmaceutical product, or one of its active ingredients, liability for infringement is not avoided by putting chemical X in a tablet or some other dosage form.
(H.R.Rep. No. 60, at p. 21). However, where "the subsequent modifications change the basic structure of chemical X so that a clearly different chemical Y results, the connection between the patented process and the product chemical Y is broken." (H.R.Rep. No. 60, at pp. 20-21) (emphasis added).
Here, the differences between compound 6 and cefaclor are manifest. Once compound 6 is created, it must be subjected to four fairly complex process steps in order to convert it into cefaclor. Initially, the hydroxy group is removed from the 3-position and is replaced with chlorine. The resulting compound (compound 7) is subjected to a reaction to remove the phenylacetyl side chain from the 7-position group, creating compound 8. From there, compound 9 is created when a phenylglycine side chain is added. Finally, the p-nitrobenzyl protecting group is removed from the 4-position, creating cefaclor. Thus, in the course of these four process steps, three chemical groups are removed and two are added.
Because of these structural differences, compound 6 and cefaclor are characterized by different biological properties. For example, in contrast to cefaclor, which has an *857 exceptionally high antibiotic activity, compound 6 has no antibiotic activity. See Hearing Trans. at 353.[5] Further, unlike cefaclor, compound 6 cannot be taken orally. Oral activity is important because a drug that must be administered by injection requires a hospital visit or a doctor's appointment, but an oral antibiotic can be taken easily at home. (Chauvette Test., Transcript at 327-28). This convenience not only makes oral antibiotics more desirable commercial products, but it lowers the costs associated with medical care.
Taken together, these molecular and biological differences highlight the obvious; compound 6 and cefaclor have fundamentally different utilities. Compound 6's only known utility is to serve as a multi-purpose intermediate that is useful in the synthesis of a variety of other cephem compounds, including chlorocephalosporins, halocephalosporins and methoxycephalosporins. See U.S. Patent No. 4,160,085, Column 3 at lines 1-6; Gorman Test., Transcript at 377-78. Cefaclor's utility, by contrast, is that of a powerful antibiotic drug. Whereas cefaclor is a medicine, compound 6 is merely a raw material that can be used for making medicines. Cefaclor, then, is like a finished automobile, while compound 6 is the iron ore that must be refined and alloyed with carbon to make the steel to make the components of the automobile. While the latter has the potential to become one of a vast number of useful products, the former represents one possible realization of that potential.[6]
In sum, there is little dispute that cefaclor has significantly different biological properties from compound 6. (Corey Test., Transcript at 118, 121; Chauvette Test., Transcript at 331; Gorman Test., Transcript at 398). Because Opos' additional processing steps "change the physical or chemical properties of the product in a manner which changes the basic utility of the product," compound 6 has been materially changed. (S.Rep. No. 83, at 70). Accordingly, the Court finds that Lilly is not likely to succeed on the merits of its infringement claim.
In response, Lilly advances two arguments. First, it asserts that, notwithstanding their differing molecular and biological properties, cefaclor and compound 6 are essentially the same thing. Both have as their "fundamental common core structure" the cephalosporin nucleus. (Baldwin Test., Transcript at 191-192). Because this nucleus remains intact during steps 6-9, Lilly contends that the "basic structure of Compound 6 is unchanged by the subsequent processing steps." (Plaintiff's Proposed Findings, at ¶ 62). Thus, there is no material change.
However, to argue that section 271(g) does not distinguish one cephalosporin from another, despite profound differences in molecular structure, pharmacological purpose and biological properties, is to deny the subtlety that is synthetic chemistry. The cephalosporin nucleus is common to hundreds or even thousands of diverse cephalosporin compounds. (Corey Test., Transcript at 42-43). Since the early 1970's, extensive research efforts at Lilly and elsewhere have been directed at making seemingly minor changes to the cephalosporin nucleus in the hope of finding superior new antibiotics.[7] Because the difference between a new miracle drug and a useless compound hinges on the specific processing steps conducted after the nucleus is created, we hesitate to conclude that all cephalosporins are alike. Indeed, to say otherwise *858 would extend the Shionogi process patent to cover the entire diverse world of cephalosporins.
Second, Lilly argues that steps 6-9 of the Opos process do not materially change compound 6 because they represent "common, conventional and routine reactions that are well known to organic chemists." (Brief in Support at p. 14).[8] In support, it points to language in the legislative history indicating that trivial or conventional processes are not material:
[T]he subsequent processing modifications of chemical X may only be trivial or of a conventional nature even though a material change occurred in chemical X. For example, modifications which result in the formation of simple derivatives, including salts or esters, or the removal of impurities, are not material changes of chemical X.
(H.R.Rep. No. 60, at 21) (emphasis added).[9] Despite being internally inconsistent, however, this passage makes one thing clear: the use of the terms "conventional" and "trivial" refers not to the inventiveness or novelty of the subsequent processing steps, but to the significance of the change produced by those steps. In other words, the creation of a simple derivative (or the removal of impurities) is a trivial process because it fails to change the basic utility of the product, not because the process represents a well-known, unexceptional reaction. Indeed, neither section 271(g) nor its legislative history use the words "novel" or "innovative" to differentiate an immaterial change from a material one. In short, by adding the "materially changed" limitation, Congress restricted the scope of section 271(g) in order to limit a patentholder's monopolistic control over downstream products that are "too far removed from the patented process" to warrant infringement liability, not to protect innovation per se. (S.Rep. No. 83, at p. 70).
When seen in that context, Lilly's argument becomes unconvincing. This is simply not a case where the final product and its intermediate (though one is a liquid and the other, a solid) are essentially the same product, having similar biological properties and comparable uses. Indeed, "if one could make a simple salt, acid, liquid, powder or ester of compound 6, it would remain an intermediate and not a useful antibiotic." (Gorman Decl. at ¶ 5). Nor is this a case where the intervening process steps constitute a minor chemical conversion, such as the mechanical removal of a protection group.[10] Rather, cefaclor and compound 6 are two vastly different chemicals with differing molecular structures, biological properties, and serving different pharmacological purposes.
Finally, we note that our reasoning accords with Marion Merrell Dow, Inc. v. American Cyanamid Co., 1994 WL 173806 (D.N.J. 1994), the only reported case to discuss at any length the "materially changed" limitation. In that case, the patent at issue involved a process for making a vasodilator, which is a cardiovascular agent that enlarges blood vessels. Specifically, the patent contemplated the creation of two related products, depending on which starting material was used. If the starting material utilized hydroxyl, "diltiazem precursor" resulted. In order to convert diltiazem precursor into the commercial drug "diltiazem," an acetylation step was necessary. If, on the other hand, the starting material utilized an acetyl group, diltiazem resulted directly and no acetylation process was required.
The defendant in Marion used the patented process to create diltiazem precursor and *859 then imported diltiazem into the United States after conducting the acetylization step. The defendant claimed that the intervening acetylization step represented a material change in the diltiazem precursor, thus exempting it from infringement liability. Ultimately, after finding that diltiazem and its precursor were "not different products," the court disagreed. Id. at *7.
Marion is therefore distinguishable from the case at bar for several reasons. First, in Marion the end product could have been manufactured directly by the patented process, but the infringer sought to manufacture it indirectly. In this case, by contrast, compound 6 cannot be transformed into cefaclor "without making, at a minimum, those changes" described in steps 6-9. (Baldwin Test., Transcript at 172). Second, in Marion the intermediate product (diltiazem precursor) could be only converted into one product  diltiazem. Compound 6, however, is a multi-purpose intermediate that is useful in the synthesis of a wide variety of cephalosporins in general, and cephalosporin antibiotics in particular.[11] Finally, diltiazem and its precursor, though they exhibited some differences in activity and efficacy, were "not different products." Id. at * 7. Indeed, it was the patented process that created the desired vasodilator activity in both compounds. Here, however, compound 6 and cefaclor are completely different products exhibiting different biological properties. Moreover, the useful biological properties of cefaclor are created by changes to the 3-, 4- and 7-positions in steps 6-9, not by the patented process.
In sum, Congress could have chosen to protect U.S. process patents by defining an act of infringement to include every foreign-made product that is manufactured by a patented process. It chose, however, to restrict the scope of section 271(g) to exclude downstream products that, due to intervening processing, cease to have a strong nexus to the patented process. Such is the case here. Steps 6-9 of the Opos process result in two "clearly different chemicals" that have differing molecular structures, biological properties, and that serve different pharmacological purposes. (H.R.Rep. No. 60, at p. 21). These differences are manifest, despite a nucleus common to both and despite the relative ease with which one can be processed into the other by a person skilled in the cephalosporin art. As a result, the Court finds that because cefaclor represents a material change to compound 6, Plaintiff is unlikely to succeed on the merits of its infringement claim.[12]

B. Irreparable Harm
Next, Lilly must establish that it will suffer irreparable harm if the preliminary injunction is not granted. Irreparable injuries are those that are impossible to measure in monetary terms. Atlas Powder, 773 F.2d at 1233. "Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." Cordis Corp. v. Medtronic, Inc., 780 F.2d 991, 996 (Fed.Cir.1985) (quoting S.J. Stile Associates, Ltd. v. Snyder, 68 C.C.P.A. 27, 646 F.2d 522, 525 (1981)).
Generally, a presumption of irreparable harm arises when a patentee makes a strong showing that its patent is both valid and infringed. High Tech Medical Instrumentation v. New Image Industries, Inc., 49 F.3d 1551, 1556 (Fed.Cir.1995); Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 954 (Fed.Cir.1990); H.H. *860 Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed.Cir.1987). That presumption is unavailable here, however, because Lilly did not clearly show that it is likely to succeed in proving that the defendants have infringed claim 5 of the '085 patent.
Even without the aid of a presumption, Lilly maintains that it has demonstrated irreparable harm because the introduction of generic cefaclor products would have incalculable, hence irreparable, effects. For example, Lilly claims that generic competition would cause it (1) to lose market share to generic cefaclors and other types of oral antibiotics, (2) to lower its prices to compete, thus eroding the existing price structure for generic cefaclor and Ceclor®, and (3) to lose customers. The loss of market share, customers and existing price points will in turn result in lower profits, which could force Lilly to reduce its research and development budget, among other things. Lilly also stresses that the limited duration of a patent weighs in favor of a finding of irreparability because "the principal value of a patent is its statutory right to exclude." H.H. Robertson, 820 F.2d at 390.
Initially, we note that the finite nature of a patent grant, which excludes others from practicing the claimed invention for a limited period of time, does not require a finding of irreparable harm. To say otherwise would be tantamount to an automatic finding of irreparable harm every time a patentee alleged infringement. Indeed, for that very reason, the Federal Circuit has recently rejected this argument:
[I]f the right to exclude during the litigation period alone established irreparable harm, the presumption of irreparable harm stemming from a finding of likely success could never be rebutted, for every patentee whose motion for a preliminary injunction is denied loses the right to exclude an accused infringer from the market place pending the trial.
Reebok Int'l, Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1558-59 (Fed.Cir.1994).
Nor are the loss of sales, profits and market share, absent special circumstances, sufficient to constitute irreparable harm. As stated by the Federal Circuit:
[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.
Nutrition 21, 930 F.2d at 871 (citations omitted). Although Lilly spills much ink speculating on the endless ripple effects a loss of profits might produce, the simple fact is that it, like all businesses, requires money to fund its varied operations. Thus, if the simple recitation of potential economic injuries like the loss of sales, market share and profits could signify irreparable harm, it "would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances." Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed.Cir.1990); see also Nutrition 21, 930 F.2d at 871.
Moreover, the specific circumstances of this case suggest that an award of money damages would be an adequate remedy in the event that Lilly ultimately establishes that the Opos process infringes the '085 patent. Indeed, because the parties to this suit are responsible for all the cefaclor sold in the United States, calculation of lost profits would be relatively easy. The Defendants would simply tally the number of cefaclor units they sold from April 27, 1995 (the date they received FDA approval), through July 3, 1996 (the expiration date of the '085 patent), and then multiply that number by Lilly's expected profit margin per cefaclor unit. Since the Defendants have computerized methods that enable them to keep "very detailed records of sales," the calculation process is further simplified. (Test. of Dr. Michael Dey, Transcript at 437). Finally, there is unrebutted evidence in the record that Zenith and Cyanamid have adequate assets with which they could pay any money judgment likely to be awarded, militating further against a finding of irreparable harm. See, e.g., Nutrition 21, 930 F.2d at 871 (no finding of irreparable harm because the defendant was a "large and financially responsible company which would be answerable in damages").
*861 Thus, because we find that any harm Lilly suffers due to the Defendants' entrance into the generic cefaclor market can be fully compensated by money damages, Plaintiff has failed to establish the requisite irreparable harm.

C. The Other Factors
While a district court must consider all four factors before granting a preliminary injunction to determine whether the moving party has established its burden, it need not "articulate findings on the third and fourth factors when the court denies a preliminary injunction because a party fails to establish either of the two critical factors [i.e., likelihood of success and irreparable harm]." Reebok, 32 F.3d at 1556 (emphasis in original); see also High Tech Medical Instrumentation v. New Image Industries, 49 F.3d 1551, 1558 (Fed.Cir.1995). Here, Plaintiff has failed to establish both: it is not likely to succeed on the merits and it has not demonstrated an irreparable harm. As a result, we abstain from making any findings concerning the balance of hardships and the public interest.

III. CONCLUSION.
The award of a preliminary injunction is a drastic remedy, causing hardship both to the patentee, if denied, by delaying the exercise of its time-limited property right to exclude, or to the alleged infringer, if granted, by requiring removal of its product from the market. Illinois Tool Works, 906 F.2d at 683. As a result, the burden of persuasion falls squarely on the plaintiff to show that it is entitled such extraordinary relief. Here, Lilly has neither sufficiently persuaded the Court of its likelihood of success on the merits, nor established irreparable injury. We therefore DENY its motion for preliminary injunction.
It is so ORDERED.
NOTES
[1] The parties have stipulated for purposes of this motion that "Cyanamid includes Lederle and vice versa." (Plaintiff's Proposed Findings of Fact, at p. 2).
[2] As described below, this enol cephem intermediate corresponds to compound 6 in the Opos process.
[3] Although Lilly believes that the defendants are also infringing Patent No. 4,346,218, only the '085 patent is relied upon by Lilly in support of this motion.
[4] As summarized Senator Charles Grassley of the Senate Judiciary Subcommittee on Patents, Copyrights, and Trademarks:

There, of course, is something very inherently unfair about U.S. researched-based industries pouring resources into a product or a process patent and then having that product or process pirated abroad and shipped back into this country for sale. The inventor, of course, is required to disclose his or her process patent, and it is available in the Patent Office just like some recipe in a cookbook for all to see.
Process Patent Legislation: Hearing Before the Subcomm. on Patents, Copyrights and Trademarks, 100th Cong., 1st Sess. 4 (1987).
[5] According to Mr. Chauvette, the Lilly scientist who invented cefaclor, cefaclor's potent antibacterial properties result from the removal of the hydroxy group at the 3-position and its replacement with chlorine. Chlorine draws electrons away from the cephalosporin nucleus, destabilizing the molecule and thus making it significantly more active against bacteria than cephalexin, a related cephalosporin. (Chauvette Test., Transcript at 331-32).
[6] As emphasized in the Senate Report:

The Committees recognizes [sic] the concern raised concerning possible overreach. One example is a process patent for extracting minerals from the earth. There is no intent that the minerals, eventually refined, with the product ending up as a component of an automobile which is imported into this country, should subject the importer to an infringement action.
(S.Rep. No. 83, at p. 72).
[7] For example, the simple replacement of the methyl group in cephalexin with a chlorine atom resulted in a compound (cefaclor) that has ten times the antibacterial capabilities, thus allowing it to be used in certain clinical situations where cephalexin could not.
[8] Professor Corey, for example, testified that steps 6-9 result in "rather simple derivatives" of compound 6 because "they're interconnected by obvious transformations [that] are quite obvious and standard." (Corey Test., Transcript at 89).
[9] The Senate Report contains similar language:

Usually a change in physical form of a product (e.g., granules to powder, solid to liquid) or minor chemical conversion (e.g., conversion to a salt, base, acid, hydrate, ester, or addition or removal of a protection group) would not be a "material" change.
(S.Rep. No. 83, at p. 70).
[10] Indeed, a Lilly expert, Professor Baldwin identified both step 6 (where a chlorine atom is added to the 3-position) and step 8 (where a D-phenylglycine side chain is added to the 7-position), as key steps in the Opos process because they "are important or necessary for the identity and utility of cefaclor." (Baldwin Test., Transcript at 196).
[11] For example, the evidence suggests that compound 6 can be synthesized into cefprozil (U.S. Patent No. 4,870,168), ceftizoxime, and ceftibuten (U.S. Patent No. 4,634,697). (Gorman Test., Transcript at 379-93), among others. Significantly, Plaintiff does not contest this evidence, except to say that cefaclor is the only drug "that could be conveniently manufactured from" it. (Plaintiff's Proposed Findings, at ¶ 78) (emphasis added). As discussed above, however, the Court finds that the convenience of the subsequent processes immaterial, except to the extent they indicate the importance of the change generated by those processes.
[12] Although Lilly purchased the '085 patent from Shionogi on the same day that it filed this lawsuit, the Court declines to infer any legally cognizable impropriety from the timing of its acquisition, particularly in view of convincing evidence suggesting that Lilly and Shionogi have been longstanding partners in the joint development of pharmaceuticals.