**COLLAGENEX PHARMACEUTICALS, INC. et al., Plaintiffs,**

v.

**IVAX CORPORATION, et al., Defendants.**

**No. 04CV4253(SLT)(VVP).**

United States District Court, E.D. New York.

June 15, 2005.

Ronald J. Baron and Alan M. Sack, Hoffmann & Baron, LLP, Syosset, New York, and Douglas A. Cawley, McKool Smith, PC, Dallas, Texas, for plaintiffs CollaGenex Pharmaceuticals, Inc. and The Research Foundation of State University of New York.

William L. Mentlik, Roy H. Wepner and Samantha M. Kameros, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, Westfield, New Jersey, and Jay B. Shapiro and Samuel O. Patmore, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, Florida, for defendants IVAX Corporation, IVAX Pharmaceuticals, Inc.

Leslie Morioka and John Schaibler, White & Case LLP, New York, New York, for defendant CorePharma, LLC.

## MEMORANDUM & ORDER

TOWNES, District Judge.

By order dated January 21, 2005, this Court referred this matter to Magistrate Judge Viktor Pohorelsky for a Report and Recommendation on the Plaintiffs' motions for a temporary restraining order and a preliminary injunction.

A district court judge may designate a magistrate to hear and determine certain motions pending before the Court and to submit to the Court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within ten days of service of the recommendation, any party may file written objections to the magistrate's report. *See id.* Upon *de novo* review of those portions of the record to which objections were made, the district court judge may affirm or reject the recommendations. *See id.* The Court is not required to review the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Judge Pohorelsky has recommended that this Court deny the Plaintiffs' motions for a temporary restraining order and preliminary injunctive relief. Plaintiffs filed

timely objection to the magistrate's report and the defendants IVAX Corporation and IVAX Pharmaceuticals, Inc. filed a timely response in opposition to Plaintiffs' objections.

The Court has carefully reviewed all papers in connection with: (1) all submissions by the parties in support of and opposition to the grant of Plaintiffs' motions; (2) the transcript of the proceedings held before Judge Pohorelsky on January 31, 2005; and (3) the instant objections to the Report and Recommendation and response thereto. In addition, this Court reviewed additional submissions by the parties on the issue of irreparable harm and heard proof and further argument regarding this issue on May 23, 2005.

Applying the *de novo* standard of review, the Court adopts and affirms the Report and Recommendation.

## DISCUSSION

"A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech. Inc.*, 995 F.2d 1566, 1568 (Fed. Cir.1993). While "grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 is within the discretion of the district court," *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed.Cir.1996), the burden is always on the movant to make a clear showing of entitlement to such relief. *Intel*, 995 F.2d at 1568. To obtain preliminary injunctive relief, the movant must show four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm if preliminary injunction is not granted; (3) that the balance of hardships tips in its favor; and (4) the impact of the injunction on the public interest. *Reebok Int'l. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988). Upon a paten-

tee's failure to make a clear showing of any one of the four factors, a trial court may deny the motion. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973–4 (Fed. Cir.1996).

*Likelihood of Success on the Merits*

■ To show a reasonable likelihood of success on the merits, the movant must show infringement and validity of the patent. *Reebok*, 32 F.3d at 1555. In his Report and Recommendation, Judge Pohorelsky concluded that the Plaintiffs failed to satisfy their burden of proving that either of the Defendants' non-infringing and invalidity arguments lack substantial merit. The Plaintiffs object and argue that the recommendation as to each issue is clearly erroneous. This Court agrees with the sound logic employed by Judge Pohorelsky and adopts the findings made and the analysis performed by him.

Serious issues are raised by the Defendants as to whether the Plaintiffs' claims fail under prior art or the doctrine of double patenting. It is premature on this incomplete record to make findings in that regard, but since the Plaintiffs have failed to meet their burden of establishing that these issues are lacking in merit, a preliminary injunction should not issue.

*Irreparable Harm*

■ Having failed at showing a likelihood of success on the merits, Plaintiffs are not entitled to the presumption of irreparable harm. *Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed.Cir.1996). Judge Pohorelsky determined that Plaintiffs failed to make a showing of irreparable harm based on the following factors: (1) "most of [the harms alleged] emanate from an expected sharp drop in revenue," which can be compensated with money damages, particularly when the defendant would be able to satisfy any judgment that may be entered against it;

(2) loss of the opportunity to develop other drugs is insufficient to constitute irreparable harm; (3) Plaintiffs failed to allege loss of a business; (4) Plaintiffs' decision to bargain away its rights to Mutual did not weigh in favor of Plaintiffs; and (5) Plaintiffs' failure to disclose in its January 20, 2005, SEC Form 8–K that its viability was in danger. (Report and Recommendation at 13–16.)

In their objections to Judge Pohorelsky's Report and Recommendation (the "Objections"), Plaintiffs ask the Court to consider that monetary damages do not preclude a finding of irreparable harm; that there is a short period of time remaining on the patent; that loss of research and development constitutes irreparable harm; and that the Court ignored a nonbinding opinion granting an injunction to CollaGenex on what it describes as "almost identical" circumstances.

*Money Damages*

■ Plaintiffs argue that Judge Pohorelsky determined there was no irreparable harm "solely on a determination that the alleged infringer can pay money damages." (Objections at 5.) However, Judge Pohorelsky found a lack of irreparable harm not only because Plaintiffs' damages are quantifiable, but also because Plaintiffs have not made a persuasive argument that CollaGenex will not recover from the harm that would result should the Court deny its request for an injunction. Quantifiable monetary damages on their own cannot constitute irreparable harm, *Eli Lilly*, 82 F.3d at 1578, but Judge Pohorelsky found that Plaintiffs showed little more than potential monetary damages. His Report and Recommendation found Plaintiffs' arguments that CollaGenex would be in financial ruin if the injunction does not issue unconvincing, particularly in light of both its SEC filings and voluntarily bargained-for agreement with Mutual.

In its moving papers and accompanying affidavits from Brian Gallagher, former Chief Executive Officer ("CEO") of CollaGenex and Colin Stewart, current CEO, Plaintiffs repeat that in the absence of an injunction, CollaGenex faces the possibility of economic collapse. (Gallagher Decl. ¶ 49 (sales by Defendants "will cause immediate and irreparable injury to CollaGenex and threaten its viability"); Stewart Decl. ¶ 31, 41 (sales by Defendants "threaten[ ] its viability as a pharmaceutical company" and "would destroy the value of CollaGenex"); Pl. Mem. of Law in Support of Mot. for T.R.O. at 16 ("CollaGenex will lose its ability to continue as a viable pharmaceutical company."); Pl. Mem. of Law in Support Em. Mot. for Prelim. Inj. at 38 ("This scale of harm is not compensable by monetary damages alone because it represents the loss of a business."); *Id.* at 41 ("With Periostat® being CollaGenex's only major source of revenue, it would be unlikely to survive."))

Plaintiffs also argued that CollaGenex is a "one-product Company," *Id.* at 39, that "Collagenex cannot yet finance its research and development program from sources other than Periostat®," Stewart Decl. ¶ 6, and that "severely diminishing revenues [which would result without an injunction]...would force CollaGenex to abandon development work under-way...including its work on treating acne, rosacea, and Kaposi's Sarcoma, and its plans to explore new indications and other technologies." *Id.* at ¶ 33.

*Additional Submissions*

Subsequent to Judge Pohorelsky's Report and Recommendation, the parties submitted additional evidence on the issue of irreparable harm. The letters and declarations submitted by the parties, and the exhibits attached thereto, negate Plaintiffs' allegation that CollaGenex would suffer catastrophic loss and therefore be unable

to develop other products if the injunction is not issued.

On May 16, 2005, Defendants submitted a copy of CollaGenex's April 22, 2005 letter to its shareholders. (Letter from Wepner to Court of 5/16/05.) In it, Plaintiffs opined that, in the absence of the injunction requested of this court, CollaGenex "anticipates that Periostat® will be subject to generic competition sometime during 2005, which will cause our sales of Periostat® and Mutual's branded version of Periostat® to decline significantly. When this occurs, we will execute plans to reduce our cost base. *None of these actions will affect our commitment to develop Oracea and our dermatology franchise.*" (Shapiro Decl. Ex. A at 3) (emphasis added).

On May 5, 2005, CollaGenex held a First Quarter 2005 Earnings Conference Call in which CEO Stewart stated: "we believe it is more likely than not that the generic form of Periostat® will be approved by the FDA and launched sometime in the near future." (*Id.* Ex. B at 2.) Stewart goes on to describe the actions taken by CollaGenex "to manage the impact of the launch which generic form [*sic*] of Periostat® will have on our business." (*Id.*) Included in these actions are the reduction of the level of inventories held by Plaintiffs' wholesale customers, and Plaintiffs' decision to write off some of its inventory. (*Id.*) Stewart concluded his prepared statement with the following: "We are...*well prepared* for an eventual entry [of generic competition] and remain very focused on the *significant* opportunity that lies ahead in dermatology." (*Id.* at 3) (emphases added).

Plaintiffs responded to Defendants' May 16 submission with a letter dated May 17, 2005, attaching an article from the Philadelphia Inquirer, a copy of CollaGenex's Form 8–K, filed on May 16, 2005 and the transcript of May 16, 2005 conference call held by CollaGenex "to Announce Restructuring." (Letter from Sack to Court of 5/17/05, Exs. D–F.) Each document confirms CollaGenex's plan to cut 63 of 135 employees if the injunction was not ordered by May 20, 2005. (Letter from Sack to Court of 5/17/05, Exs. D–F.) The 8–K quoted Stewart as stating: "While we are clearly disappointed with the generic approval, we remain confident in our ability to build CollaGenex's dermatology franchise." (Letter from Sack to Court of 5/17/05, Ex. E at 5.) And, in the conference call, Stewart announced that "[f]or the past 18 months, we at CollaGenex have stressed our strategy of building CollaGenex into a more broadly based speciality pharmaceutical company initially concentrating on dermatology and launching products from our own development pipeline." (Letter from Sack to Court of 5/17/05, Ex. F at 2.) Stewart said this *after* announcing the layoffs and budget cuts that Collagenex, by this point, had already contemplated. (*See id.*)

Defendants submitted a letter pointing out Plaintiffs' failure to reconcile the statements made in their moving papers with those made to their shareholders and on their conference calls. (Letter from Mentlik to Court of 5/18/05.) With oral argument on this issue scheduled for May 23, 2005, Plaintiffs submitted an additional Declaration on Sunday May 22 at 11:23 p.m. (*See* Supplemental Stewart Decl.) In it, Stewart now says, *inter alia*, that "the confidence of CollaGenex's employees, customers, strategic partners and investors in CollaGenex's ability to continue as an innovative growing presence *in the dental market*" has been undermined. (*Id.* at ¶ 6) (emphasis added). Indeed, the irreparable harm alleged by CollaGenex, in this declaration, is largely related to its position in the dental market. (*Id.* at ¶ 12 ("In the *dental* area the following programs will be abandoned or postponed...."); ¶ 13

("[I]f CollaGenex loses its established presence in the *dental* market..."); ¶ 14 ("Our strategic partners in the *dental* business...have also voiced concerns that their relationships with CollaGenex may not be viable in light of the uncertainty surrounding the future of CollaGenex's *dental* business"); ¶ 19 (CollaGenex "would not be able to resurrect its *dental* business"); ¶ 20 ("With an injunction, CollaGenex... [will be able to] maintain the goodwill it has built as a pioneer in the *dental* market place."); ¶ 21 ("With an injunction, CollaGenex will also have the revenues to be able to continue the development of Periostat MR and successor IMPACS™ compounds that have shown promise in the *dental* area.")) (emphases added). Prior declarations and memoranda made no such distinction.

The Stewart declaration also alleged that the restructuring plan formulated by CollaGenex "contemplates abandonment or postponement of various research and development initiatives which previously have been disclosed as targeted for completion or significant progression in the period between now and mid–2007," Supplemental Stewart Decl. at ¶ 11, and that certain non-dental research and development projects would be impossible without Periostat® revenues, including "dry eye," Restoraderm™, COL–3, and IMPACS™, *Id.* at ¶¶ 15–18. Outside funding for COL–3, Plaintiffs argue, would become difficult to obtain in light of the "depressed level of CollaGenex share price," and "[s]trategic partners in the non-dental business have voiced their concerns that their relationships may need to be reviewed." (*Id.* at ¶¶ 16–17.)

*Oral Argument*

The Court scheduled an oral argument in order to direct the parties to address a limited number of documents bearing on the issue of irreparable harm: the CollaGenex April 22, 2005 Annual Report to its shareholders, the transcript of the May 5, 2005 conference call and the exhibits attached to Plaintiffs' May 17, 2005 letter to the court.[1] (Transcript of 5/23/05 Oral Argument ("Tr.") at 4.)

Again, Plaintiffs focused on the distinction, absent prior to the Report and Recommendation, between loss of its entire business and loss of its dental business:

> Plaintiffs' Counsel: [B]y the time this Court finally decides with the assistance of a jury whether this patent is infringed and what the damages are, this company will have been irreparably harmed, even if it still exists. It won't exist, it won't be viable in the form in which it exists today, a dental company.
>
> [.  .  .  .]
>
> The Court: Let me ask you this. You are confusing me because you are saying on the one hand that they may be able to survive.
>
> Plaintiffs' Counsel: Yes, Your Honor.
>
> The Court: On the other hand that the viability of the company as it exists...
>
> Plaintiffs' Counsel: The viability of the company. Periostat® has always been known in the marketplace -
>
> The Court: But if it can be replaced with something else.
>
> Plaintiffs' Counsel: If it can be replaced with something else then they may survive, but their survival does

---

**1.** By no means are these the only documents considered by the Court in evaluating whether the Plaintiffs have made an adequate showing of irreparable harm. The Court has considered all of the memoranda, affidavits and declarations, letters and exhibits submitted by the parties and requested argument on certain documents produced after briefing of the motions for a T.R.O. and preliminary injunction.

not negate the irreparable harm they have suffered.

(Tr. 10–11.) Plaintiffs then argued that irreparable harm exists because of loss of market share, loss of employees, loss of opportunity to pursue dental products, loss of research and development, loss of shareholder value, loss of reputation in the marketplace and loss of licensing revenues to SUNY.

The Court then asked Plaintiffs' counsel about the contingency plans stated in the documents at issue:

> Plaintiffs' Counsel: What this company has said, Your Honor, is no more than this: With $36 million in the bank, if we suffer the devastating loss of our patented product, which cuts off irrevocably the last two years of our patent's life, we are not simply going to go out of business. We are going to take that $36 million and try to become a successful dermatology company.
>
> The Court: That is not what has been argued here, What has been argued here is that the loss of profit from Periostat® will result in an inability to fund any other, including the dermatological.
>
> Plaintiffs' Counsel: With respect, Your Honor, that statement Your Honor just made is absolutely correct with the single exception of the word "any other." The plaintiff has alleged...that many of the research and development and other research programs will have to be eliminated, and indeed, many have been eliminated within the last two weeks...The annual report concluded by saying that this is going to be an exciting new phase of the company's development, which I think, Your Honor, calls to mind the old curse, may you live in exciting times. I think it may be, but

that doesn't mean that it is going to be pleasant for either CollaGenex or its investors.

(Tr. 13–14.) Plaintiffs did not say that it "is going to be pleasant" but *did* optimistically declare that "[n]one of these actions will affect our commitment to develop Oracea and our dermatology franchise," that CollaGenex is *"well prepared* for an eventual entry [of generic competition] and remain[s] very focused on the *significant opportunity* that lies ahead in dermatology;" and that CollaGenex has "a strong balance sheet;" "no debt" and "expect[s] to increase [its] dermatology sales force significantly in early 2006 for the Oracea launch." (Shapiro Decl. Ex A at 3; Ex. B at 3) (emphases added). Plaintiffs now ask the Court to read "exciting" as being ambiguous in the face of these positive statements.

On cross-examination, Stewart was presented with his declaration, submitted on January 20, 2005, in support of the instant motions, in which he declared, multiple times and under oath, that the viability of CollaGenex as a company was threatened by the prospect of generic competition with Periostat®. (Tr. 40–41.) When asked to reconcile the statements as to CollaGenex's overall viability with Plaintiffs' new argument that it is CollaGenex's dental business that was described as possibly ceasing to exist, the following colloquy ensued:

> Defense Counsel: Again, no qualification [in your declaration] that you were only concerned about your dental business, you were talking about the whole company there, weren't you?
>
> Stewart: Yes, I was talking about the whole company.
>
> Defense Counsel: Again, despite the fact that you had plans to expand your business into the dermatology field

and were in the throes of actually doing so, is that correct?

Stewart: Yes.

(Tr. 40–41.)

Defense counsel then asked about the statement in Stewart's declaration that development of "its current work on treating acne, rosacea, and sarcoma" would have to be abandoned in the absence of an injunction. (Tr. 41.) Stewart replied, "No. We have discontinued work on sarcoma. We said with regard to acne, we couldn't afford to develop that all the way through, without having Periostat®." (Tr. 41–42.) Therefore, the statement as to rosacea (the condition for which Plaintiffs are currently developing Oracea) is inaccurate and it remains funded.

Defense counsel moved on to the statements bearing on Plaintiffs' viability that were contained in the memoranda submitted in support of the instant motions:

Defense Counsel: Did you consider that perhaps counsel was overstating the potential harm to the company in those briefs?

Stewart: It didn't touch me at the time.

Defense Counsel: It didn't touch you at the time. Does it touch you know?

Stewart: Yes.

Defense Counsel: So you think it was overstated to the Court?

Stewart: It could be.

Defense Counsel: For example, when it was stated to the court that the loss of revenue would lead to the destruction of CollaGenex as a viable small pharmaceutical company, at the time that didn't strike you but it does today, is that what you are saying?

Stewart: I still believe the viability of CollaGenex is threatened.

Defense Counsel: Can you show me where...in the submissions to the SEC, where in your call to investors, where in the letters to the shareholders you qualify any of your statements about the continued viability of the company as to them as you have done to the Court here?

Stewart: I made no statements to them about continued viability.

Defense Counsel: None at all...What you did was you told them we are continuing, we are selling, we are getting approvals, and we expect to do really well in the future. Isn't that what you told them?

Stewart: That is correct.

Defense Counsel: You testified in response to your counsel's questions that it is possible that you will be able to continue to survive. Could you show me where you told the investors you only thought it was possible as opposed to painting a picture for them and to the SEC that you will indeed survive?

Stewart: I have not.

Defense Counsel: You have not done that. But here in court it is only 'possible,' here in court the fate of CollaGenex is in the hands of the Court. It didn't strike you when these statements were made back in January that they were overstated, is that a fair summary?

Stewart: Yes.

(Tr. 42–43.)

On redirect, Stewart then testified that he does believe the viability of CollaGenex "may" be threatened in the absence of an injunction:

Stewart: We have no idea and no indication as to what the clinical results are in the two Oracea studies. We do not know whether the FDA will approve the drug on the basis of the documents we submit. We don't

know how long it will take the FDA to do their review. We have made an estimate that it would be 12 months. That it may be 18 months or longer. All of these steps are unknown to us.

The Court: But don't you—I'm sorry. The concern to me as I sit here when I am reading something else on the page... There is a statement allegedly here by Mr. Stewart [from the May 16 conference call] that says, "Despite the changes caused by recent events the management team remains confident that we have the resources and the skill to build CollaGenex into a broadly based speciality pharmaceutical company which sustains the focus of the vision we have been promoting for the last 18 months and this remains our focus. We believe that we will be successful." Now he says there is some doubt to that. There is no doubt expressed here.

Plaintiffs' Counsel: What resources were you referring to there, Mr. Stewart?

Stewart: The resources that we have with R and D, and the resources we have with the management.

(Tr. 45–46.) Therefore, Plaintiffs ask the Court to believe that CollaGenex did not contemplate the feasibility or likelihood of FDA approval when it made the statement, "we have the resources and the skill to build CollaGenex into a broadly based speciality pharmaceutical company." Plaintiffs appear to be arguing both that the viability of CollaGenex as a whole is threatened, and that the viability of CollaGenex's dental business is threatened even though, in its earlier filings, Plaintiffs focused on the viability of CollaGenex as a whole. Only after being called upon by Defendants, and then this Court, to reconcile the statements do Plaintiffs argue both theories with only the slightest acknowl-

edgment that the statements made in the original moving papers were overstatements. (Tr. 42–44)

In short, Plaintiffs argue (both then and now) that CollaGenex, as a whole, will be irreparably harmed, and that it is unsure whether it will be unable to cultivate its dermatological practice. Additionally, Plaintiffs now argue that loss of its dental practice alone constitutes irreparable harm.

To its shareholders and the public, Plaintiffs paint an optimistic picture of its potentially Periostat®-less future. To the Court, CollaGenex will "try" to "hopefully" recover from generic competition for Periostat® and "there is a chance" they will be profitable. (Tr. 15, 46) To the Court, "exciting" means unpleasant, perhaps catastrophic, and "calls to mind the old curse," while shareholders are told that CollaGenex "expect[s] to do really well in the future." (Tr. 43.) And, in its May 5 conference call, Stewart stated CollaGenex was "well prepare[d] for an eventual entry [of generic competition] and remain very focused on the significant opportunity that lies ahead in dermatology." (Tr. 3.) Though Plaintiffs have presented evidence of layoffs and discontinuances in relation to its dental market, it has failed to satisfactorily reconcile the statements about its dermatological endeavors given to this Court with those given in the May 5 conference call and Annual Letter, leading this Court to believe that Plaintiffs have been less than candid in its submissions hereto.

As a result, the Court is not persuaded that irreparable harm will result if CollaGenex continues, as planned, to develop its presence in the market for dermatological pharmaceuticals. The evidence and testimony presented, in conjunction with the relevant precedent of *Eli Lilly*, compel the Court to agree with Judge Pohorelsky in

finding that the significance of the harms that CollaGenex alleges it will suffer are not compelling:

> Lilly contends that the loss of profits on sales...because of competition...will result in irreparable injury to Lilly's overall pharmaceutical research efforts...[T]hat claim of injury is not materially different from any claim of injury by a business that is deprived of funds that it could usefully reinvest. If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief. Such a rule would convert the 'extraordinary' relief of a preliminary injunction into a standby remedy, available whenever the plaintiff has shown likelihood of success on the merits. For that reasons, adopting the principle that Lilly proposes would 'disservice the patent system.'

82 F.3d at 1578. Plaintiffs distinguished *Eli Lilly* solely on the ground that it is a large company for which "loss of one revenue generating product...has almost no impact." (Objection at 9 n. 11.) However, the court in *Eli Lilly* did not condition the applicability of the principles of patent law on the size of the company. It cautioned against finding irreparable harm based on factors that are likely to be present in any patent case.

*Other Objections*

In Plaintiffs' Objections, they also argued that "[i]t [was] legal error to ignore precedent and not weigh evidence of the irreparable harm CollaGenex will suffer." In arguing that a plaintiff holding a patent on which little time remains has shown irreparable harm, Plaintiffs again cite only to cases in which the party requesting the injunction has shown a likelihood of success on the merits, triggering a presumption of irreparable harm that Plaintiffs have not earned in this case. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451–7 (Fed.Cir.1988) (affirming injunction where, *inter alia*, district court found irreparable harm based on nine factors and plaintiff showed likelihood of success on the merits of validity of patent and patent infringement); *Pharmacia & Upjohn Co. v. Ranbaxy Pharm., Inc.*, 274 F.Supp.2d 597, 614 (D.N.J.2003) (injunction granted where presumption of irreparable harm given to plaintiff and, *inter alia*, damages speculative, potential for significant damage award if defendant found liable and difficulty pursuing collection overseas considered); *Ortho Pharm. Corp. v. Smith*, 1990 WL 18681, *9, 15 U.S.P.Q.2d 1856 (E.D.Pa. Feb.23, 1990) (granting defendant's motion for preliminary injunction where defendant showed likelihood of success on the merits, irreparable harm presumed and court looked to "several factors which *add* too the irreparable harm") (emphasis added).

Indeed, many of the cases cited by Plaintiffs in support of their argument that they have established irreparable harm are ones in which the plaintiff has the presumption of irreparable harm either (A) based on an earlier showing of likelihood of success on the merits and/or (B) are appeals, in which the court evaluates whether the district court committed an abuse of discretion, factors that significantly change the persuasiveness of those cases. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed.Cir.2001). In *Purdue Pharma*, a case Plaintiffs cite for the proposition that price erosion is sufficient to show irreparable harm, the plaintiff made a "clear" showing of likelihood of success on the merits, was given the presumption

of irreparable harm, which, in turn, placed the burden on the defendant to show the plaintiff would not be irreparably harmed. *Id.* at 1367–8. Defendant argued that the testimony of plaintiffs' expert regarding price erosion and market position was speculative. *Id.* "Given the testimony of the likelihood of price erosion and loss of market position without corresponding market expansion from [defendant's] product, [the court] saw no deficiency in the district court's finding of irreparable harm." *Id.* at 1368. This is not the same, as Plaintiffs here argue, as finding "price erosion sufficient." Plaintiffs here have neither the presumption of irreparable harm nor the standard of review in their favor and without either, the isolated factors to which it points are not persuasive, particularly in light of the evidence discussed and presented at the May 23 oral argument that seriously undercuts Plaintiffs' argument that CollaGenex's viability is at skate.

Similarly, the persuasiveness of *Bio–Technology v. Genentech*, 80 F.3d 1553, 1565–6 (Fed.Cir.1996) (cited by Plaintiffs in support of their argument that loss of research and development is sufficient to constitute irreparable harm), is also severely mitigated by its posture. There, the Court first acknowledged that the non-moving party failed to rebut the presumption of irreparable harm. *Id.* The court then went on: "*In addition* [to the presumption of irreparable harm], the district court determined that Genentech would be harmed if BTG were allowed to enter the market because Genentech would lose revenues and good will and would be required to reduce its research and development activities." *Id.* at 1566 (emphasis added). It did not hold that loss of research and development were sufficient to establish irreparable harm. *See also Hybritech*, 849 F.2d at 1456; *Atlas*, 773 F.2d 1230 (finding defendant's argument that the availability of money damages precluded injunction insufficient to show abuse of discretion of district court).

The cases cited by Plaintiffs that are distinguishable on significant grounds are many. Plaintiffs cite inapposite cases for their statement that "loss of business opportunity...is as significant...as substantial loss profits." *Compare* Objection at 7 *with Canon Computer Sys., Inc. v. Nu–Kote Int'l. Inc.*, 134 F.3d 1085, 1090 (Fed. Cir.1998) (no clear error by district court where plaintiff entitled to presumption of irreparable harm and defendant failed to rebut that presumption due to nature of patent and loss of market share); *and Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 864 (Fed.Cir.1987) (affirming grant of injunction and finding pacemaker industry in particular to be "highly competitive" based on precedent indicating that irreparable harm likely without injunction). Neither case equates loss of business opportunity with substantial lost profits.

Plaintiffs are correct that loss of a business needn't be total "so long as it is so great as to seriously compromise the company's ability to continue in its current form." *Galvin v. New York Racing Assoc.*, 70 F.Supp.2d 163, 170 (E.D.N.Y.1998) (Ross, J.). However, *Galvin* involved a professional equine thoroughbred racehorse veterinarian who sought an injunction to continue practicing during the pendency of investigations. *Id.* at 168. Without the injunction, the plaintiff would not have been able to practice in any of defendant's establishments, leaving him without an opportunity to practice his trade in the New York area. CollaGenex does not face a similar fate. Its lot is more comparable to the plaintiff in *P.J. Grady, Inc. v. General Motors Corp.*, 472 F.Supp. 35, 37 (E.D.N.Y.1979) (no irreparable harm where defendant terminated Buick dealership and plaintiff also main-

tained Chevrolet dealership), than the plaintiffs in cases where the one item sold by a plaintiff is taken away. *See generally Roso–Lino Beverage Distrib., Inc. v. Coca–Cola Bottling Co. of New York,* 749 F.2d 124 (2d Cir.1984) (irreparable harm where Coca–Coca bottler had no other products); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970) (irreparable harm where arrangement terminated, leaving Ford-only company without any vehicles for sale). For these same reasons, CollaGenex's argument that it is a "one-product" company is also unpersuasive. Though the Court acknowledges that, in 2004, Periostat® was source of a 80% of Plaintiffs' revenues, there is substantial evidence to indicate that there is more than one successful product in CollaGenex's portfolio.

*SUNY Plaintiff*

Additionally, Plaintiffs' argument that loss of licensing revenues to SUNY will result in irreparable harm is without merit. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed.Cir.1995) (grant of license shows that owner "is willing to forego its patent rights for compensation").

*DC Action*

The decision in *Collagenex Pharmaceuticals v. Thompson,* 2003 WL 21697344 (D.D.C. Aug.6, 2003) is not binding on this Court. However, Plaintiffs ask that the Court find irreparable harm because Judge Collyer found irreparable harm when considering the impact had the Food and Drug Administration ("FDA") approved a generic version of Periostat® at that time. However, not only did Judge Collyer, in a subsequent opinion, dismiss Plaintiffs' complaint and dissolve the injunction, 2005 WL 256561, *1 (D.D.C. Jan.19, 2005), but, the United States Court of Appeals for the District of Columbia denied Plaintiffs' emergency petition for injunctive relief pending appeal for failure to meet the "stringent standards required for injunctive relief." 2003 WL 21697344, 2005 U.S. LEXIS 1520 (D.C.Cir.2005).

In light of the foregoing, this Court agrees with Judge Pohorelsky's finding that, of the host of harms Plaintiffs claim they will suffer, "most...emanate from an expected sharp drop in revenue" which can be quantified and, without the presumption of irreparable harm that accompanies the court's finding of likelihood of success on the merits, the harms alleged are insufficient to warrant an injunction. The Court also agrees with Judge Pohorelsky that any harm caused by Plaintiffs' agreement with Mutual is harm that was bargained-for and not proper for consideration of the instant motion. Furthermore, it is significant that CollaGenex stopped supporting Periostat® before a decision on whether a preliminary injunction would issue and has no intention of attempting to compete with the generic version of Periostat®, but appears to prefer shutting down that portion of its business.[2] For these reasons, the Court finds that Plaintiffs have not made a showing of irreparable harm sufficient to warrant either a preliminary injunction or a temporary restraining order.

**CONCLUSION**

After reviewing Magistrate Judge Pohorelsky's Report and Recommendation and Plaintiffs' Objections thereto, the Court adopts and affirms the Report and Recommendation. Plaintiffs' motions for a tem-

---

**2.** Stewart testified that Plaintiffs' decision to stop supporting Periostat® was voluntary; that no effort was made to consider whether CollaGenex could lower prices and compete with other companies; and that CollaGenex wanted there to be no generic competition. (Tr. 39.)

porary restraining order and preliminary injunctive relief are denied.

SO ORDERED.

## REPORT AND RECOMMENDATION

POHORELSKY, United States Magistrate Judge.

The plaintiff's motions for a temporary restraining order and preliminary injunction have been referred to me by Judge Townes for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons below, I recommend that the motions be denied.

## I. FACTUAL BACKGROUND

This is a patent infringement action arising from the defendants' desire to market generic versions of a drug now marketed by CollaGenex Pharmaceuticals, Inc. under the brand name Periostat®. The two plaintiffs, The Research Foundation of State University of New York and Colla-Genex, are the owner and exclusive licensee, respectively, of a patent which they contend covers Periostat®. The defendants—IVAX Corporation, IVAX Pharmaceuticals, Inc., and CorePharma, LLC—have submitted separate applications to the Food and Drug Administration (FDA) for approval to market their generic versions of the drug. The plaintiffs allege that the marketing of the generic versions will induce infringements of their patent, which bears U.S. Patent No. Re. 34,656 (the "Re. '656 patent").[1]

The Re. '656 patent concerns the use of tetracyclines, a well-known class of antibiotics, to treat bone deficiency disease. It is related to an earlier patent, No. 4,666,-897 ("the '897 patent"), which is now expired and which concerned the use of tetracyclines to treat excess collagenolytic activity in mammals. One manifestation of excess collagenolytic activity in humans is periodontal disease, a disease characterized by an inflammation of the gums resulting from the presence of the enzyme collagenase. If left untreated, periodontal disease can lead to the loss of alveolar bone, the bone in which the teeth are seated. The Re. '656 patent resulted from the discovery that, in addition to reducing the levels of collagenase, tetracyclines promote the growth of bone by enhancing bone protein synthesis. As a result, tetracyclines may be used not only to treat periodontal disease by reducing the excess collagenolytic activity that causes the disease, but also to replace alveolar bone which has been lost as the result of untreated periodontal disease. The Re. '656 patent sought to take advantage of this discovery by asserting claims for methods of treating bone deficiency disease through the use of tetracyclines.

The drug Periostat®, which the plaintiff CollaGenex markets and which the plaintiffs contend is protected by the Re. '656 patent, is a 20 mg oral dose of doxycline hyclate, a compound that is a member of the tetracycline family. CollaGenex obtained approval for Periostat® from the FDA in 1996, which authorized Periostat® "for use as an adjunct to scaling and root planing to promote attachment level gain and to reduce pocket depth in patients with adult periodontitis." Periostat Package Insert, Scheibeler Decl., Ex. 1.

The Re. '656 patent has already been the subject of several infringement law-

---

1. The claims of the Re. '656 patent at issue here arc directed to a method of use. Since the defendants will not themselves be using the generic drugs, but rather will be selling the drugs for others to use, the defendants will not themselves be infringing the Re. '656 patent, but rather will be inducing those who use the generics to infringe the method of use purportedly protected by the Re. '656 patent.

suits, all of which were settled. The most notable action was an infringement action brought in this district by the plaintiffs against the Mutual Pharmaceutical Company, Inc. Like the defendants here, Mutual had sought FDA approval for a generic version of Periostat®. That action was resolved by a settlement in which Mutual agreed that the plaintiffs' patent was valid and enforceable, and would be infringed by the manufacture and sale of Mutual's generic version. In return, however, Mutual received, among other things, $2,000,000 in cash and a license to distribute Periostat® manufactured by CollaGenex. In addition, if another generic version of Periostat® is marketed by some other company for a certain, agreed upon (but confidential) number of consecutive business days, Mutual's license becomes royalty-free and irrevocable.

The Re. '656 patent has also been the subject of a recent reexamination proceeding in the Patent and Trademark Office (PTO), commenced at the request of the plaintiff CollaGenex. As a result of the reexamination, the PTO issued a Final Office Action dated October 19, 2004 which rejected all of the claims of the Re. '656 patent on various grounds including the judicially created doctrine of double-patenting, as well as anticipation and obviousness under 35 U.S.C. §§ 102 and 103. In response, CollaGenex filed amendments limiting the claims of the Re. '656 patent in an effort to eliminate the double-patenting flaws found by the PTO. Those amendments appear to have satisfied the PTO, which on March 2, 2005 issued a draft Notice of Intent to Issue Ex Parte Reex-

amination Certificate indicating that, as amended, the claims in the Re. '656 are patentable.

The impetus for the instant motion for preliminary injunctive relief occurred on January 19, 2005, when the United States District Court for the District of Columbia dissolved a preliminary injunction that prevented the FDA from approving the defendants' applications for approval of their generic forms of Periostat®. The plaintiffs had obtained the injunction in July 2003 while the plaintiffs litigated whether the FDA had properly classified Periostat® as an antibiotic.[2] The dissolution of the preliminary injunction removed the last barrier to FDA approval of the defendants' application, and thus the marketing of the defendants' generic forms of Periostat® has become imminent.

## II. DISCUSSION

### A. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

Motions for temporary restraining orders and for preliminary injunctive relief are both determined by reference to the same four-part inquiry. In order to obtain either form of relief, the movant must show "(1) a reasonable likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) that the balance of hardships tips in its favor; and (4) that the public interest favors an injunction." *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1364–1365 (Fed.Cir.2002) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001)). Al-

---

**2.** The FDA's classification of Periostat® as an antibiotic was significant because drugs that are *not* antibiotics receive various forms of heightened patent protection under amendments to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* enacted in 1984. *See* Drug Price Competition and Pat-

ent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984). Among the additional protections provided by the amendments, generally known as the "Hatch–Waxman Amendments," are automatic stays of FDA approval of drugs alleged to infringe those protected under the Act.

though the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested," *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988), "a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com, Inc.*, 239 F.3d at 1350. Thus, "a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits.... In other words, a district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits." *National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed.Cir.2004). The determination whether to grant preliminary relief is within the sound discretion of the district court. *Tate Access Floors, Inc.*, 279 F.3d at 1365; *Amazon.com, Inc.*, 239 F.3d at 1350.

## B. *ANALYSIS OF THE PLAINTIFFS' MOTIONS UNDER THE STANDARDS*

### 1. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, the movant must show that that, in light of the presumptions and burdens applicable at trial, it will likely prove the validity of the patent at issue, and infringement of the patent by the party opposing the motion. *See Tate Access Floors, Inc.*, 279 F.3d at 1365; *Amazon.com, Inc.*, 239 F.3d at 1350. If, however, the opposing party "asserts a validity or infringement defense which the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Amazon.com, Inc.*, 239 F.3d at 1350 (citing *Genentech, Inc. v. Novo Nordisk,*

*A/S*, 108 F.3d 1361, 1364, 42 USPQ2d 1001, 1003 (Fed.Cir.1997)).

### a) *Infringement*

Although the defendants have raised a host of questions about both validity and infringement, the infringement issues appear to the court to be the most significant. The plaintiffs assert infringement under two different sections of the patent law. First, it is an act of infringement if a generic drug maker like the defendants submits an application to the FDA to gain approval to manufacture and sell "a drug claimed in a patent *or the use of which is claimed in a patent.*" 35 U.S.C. § 271(e)(2)(A) (emphasis added). Second, it is an act of infringement if one "actively induces an infringement of a patent," *id.* § 271(b), which the plaintiff contends will happen when the defendants manufacture and sell generic versions of Periostat® for the use approved by the FDA.

██  Under both provisions, the parties agree that the question of infringement ultimately rests on a single issue, i.e., whether the use for which Periostat® was approved by the FDA includes a method of treatment described by the Re. '656 patent. If it does, then an application to the FDA by the defendants seeking approval of their generic versions of Periostat® would constitute an application for "a drug ... the use of which is claimed in a patent," in violation of 35 U.S.C. § 271(e)(2)(A). The manufacture and sale of such a generic drug would also constitute inducement of infringement, in violation of 35 U.S.C. § 271(b), because of the FDA requirement that the label that accompanies a generic drug must mimic the label of the branded drug (except of course for the brand name). Since the label of an FDA-approved drug specifies the use of the drug, as approved by the FDA, if the use specified by the label for Periostat® is

a method of treatment described by the Re. '656 patent, those who purchase generic versions of the drug for use in accordance with the label will be induced to infringe that patent.

Consideration of this issue begins with a review of the relevant language of the Re. '656 patent. In their arguments the parties have focused their attention on claim 20 of the Re. '656 patent, which is the only independent claim of the patent, i.e., the claim upon which all the other claims rest. Thus, if the accused method here does not infringe claim 20, it will not infringe any of the remaining claims. Given the unsettled state of the Re. '656 patent because of the ongoing reexamination and amendment proceedings in the PTO, there are essentially two versions of claim 20 before the court. The first version of claim 20, prior to the amendments which are the subject of the most recent action of the PTO, reads as follows:

> 20. A method of treating mammal with bone deficiency disease by enhancing bone protein synthesis in said mammal which comprises administering to the mammal an effective amount of a tetracyline.

U.S. Patent No. Re. 34,656, annexed to Scheibeler Decl., Ex. 10. The amended version of claim 20 now before the PTO simply adds a phrase at the end of the claim which is italicized below:

> 20. A method of treating mammal with bone deficiency disease by enhancing bone protein synthesis in said mammal which comprises administering to the mammal an effective amount of a tetracyline *wherein the effective amount of the tetracycline is a sub-antibacterial dose.*

Amendment After Final Rejection, found at Scheibeler Decl., Ex. 9.

To determine whether the above claims describe a method of treatment within the use of Periostat® approved by the FDA depends on the description of the approved use as disclosed in the contents of the label. The defendants argue that the label does not approve use of the drug as a method of treatment described by either version of claim 20 for the simple reason that the label nowhere mentions that the drug is to be used to treat bone deficiency disease or that it enhances bone protein synthesis. They point to the critical Indications and Usage section of the label which states, "Periostat® is indicated for use as an adjunct to scaling and root planing to promote attachment level gain and to reduce pocket depth in patients with adult periodontitis." Periostat® Label, found at Scheibeler Decl., Ex. 1.

The plaintiffs concede, as they must, that the label never mentions the use of Periostat® to treat bone deficiency disease or to enhance bone protein synthesis, but argue that certain language in the Indications and Usage section amounts to the same thing. Specifically, they contend that "periodontitis" is a bone deficiency disease, and that "attachment level gain" and reduction of "pocket depth" are results that cannot occur without bone protein synthesis. They provide an expert's affidavits in support of those contentions. *See* Novak Decl., Jan. 20, 2005; Novak Supp. Decl., Jan. 27.2005.

Both contentions run headlong into serious difficulties which convince the court that the plaintiffs have failed to prove that the defendants' non-infringement argument lacks substantial merit. Taking first the question whether "periodontitis" is a "bone deficiency disease" within the meaning of the Re. '656 patent, the court is required to consider the so-called intrinsic evidence concerning the patent, and in particular the language of the claims and specifications of the patent, in construing those terms. *Astrazeneca AB v. Mutual*

*Pharmaceutical Co.*, 384 F.3d 1333, 1336–37 (Fed.Cir.2004). A review of the specification for the Re. '656 patent reveals language suggesting that the patentee drew a distinction between periodontal disease (and thus periodontitis)[3] on the one hand and bone deficiency disease on the other. Thus the specification at one point states that tetracyclines are useful in the "treatment of periodontal diseases, corneal ulcers, and the like characterized by excessive collagen destruction." U.S. Patent No. Re. 34,656, at 1:24–30,[4] found at Scheibeler Decl., Ex. 10. Later in the patent, the language discloses that "non-antibiotic or non-antibacterial tetracyclines have also been found to be useful in the treatment of periodontal diseases, corneal ulcers, bone deficiency disorders due to excess collagenase production or excessivde [sic] collagen destruction, rheeumatoid arthristis [sic] and the like." *Id.* at 1:35–40. The use of the phrase "periodontal diseases" as distinct from "bone deficiency disorders" in the patent specification is powerful proof that the inventor considered periodontal disease to be something different from, and not included within, bone deficiency disorders.

The question whether the language of the label concerning "attachment level gain" and reduction of "pocket depth" is actually a substitute for bone protein synthesis is belied by other language that appears in the label. The label also contains a section which explains how Periostat® achieves its purpose in treating adult periodontitis:

> **Mechanism of Action:** Doxycycline has been shown to inhibit collagenase activity in vitro. Additional studies have shown that doxycycline reduces the elevated collagenase activity in the gingival crevicular fluid of patients with adult periodontitis. The clinical significance of these findings is not known.

Periostat® Label, found at Scheibeler Decl., Ex. 1. This language explaining how Periostat® works contains no suggestion that any activity resembling bone protein synthesis occurs through use of the drug. Rather, the operative function of the drug is to reduce the level of collagenase activity in the gums. But according to the plaintiffs themselves, as they expressly argue elsewhere in their papers, the reduction of collagenase activity is a result achieved by the drug that is separate from the bone protein synthesis process which they contend occurs only *after* a reduction of collagenase activity has occurred. See Plaintiffs' Reply Brief at 13–14.[5]

The court concludes, from the foregoing analysis, that the plaintiffs have not satisfied their burden of proving that the defendants' non-infringement arguments lack substantial merit, and that preliminary in-

---

3. There is no dispute that periodontitis is a periodontal disease.

4. The language describing the patent is printed in separately numbered columns. The numeral "1" in this citation refers to the column number, and the numerals "24–30" refer to the line numbers within that column, where the cited language appears.

5. The plaintiffs are required to take the position that the process of bone protein synthesis through use of Periostat® occurs separately from the process of reducing excess collagenolytic activity to avoid a finding that the Re. '656 patent is invalid because of double patenting. If the two processes occurred simultaneously then the process of bone protein synthesis would be inherent in the claims of the '897 patent, which described use of tetracyclines as a method of treatment for reducing excess collagenolytic activity. When a process described in a later patent is inherent, although not specifically described, in the claims of an earlier patent owned by the same person, the later patent is likely invalid under the judicially created doctrine of obviousness-type double patenting. *See Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 968 (Fed.Cir.2001).

junctive relief therefore should not issue. *See Amazon.com, Inc.,* 239 F.3d at 1350.

### b) *Validity*

■ Although perhaps not as striking, certain other defense arguments concerning the lack of validity of the Re. '656 patent also raise concerns about whether the plaintiffs have met the burden of proving reasonable likelihood of success on the merits. Specifically, the Re. '656 patent has had a troubled history before the PTO which suggests to the court that even the most recent amendments to claim 20 may not withstand scrutiny.

As noted earlier, the Re. '656 patent has been the subject of ongoing reexamination proceedings. On October 28, 2004, the PTO issued a final office action rejecting all of the claims of the Re. '656 patent on grounds of obviousness-type double patenting in view of the now-expired '897 patent. *See* Scheibeler Decl., Ex. 6 at 2–3. In addition, certain of the claims, including claim 20, were rejected on the additional grounds of being anticipated by prior art and being obvious in view of prior art.

In an effort to save the patent, the plaintiffs sought further review before the PTO by narrowing claim 20, and other claims as well. The PTO has now issued a Notice of Intent to Issue *Ex Parte* Reexamination Certificate indicating that the PTO's double-patenting rejection is being withdrawn because of the narrowing of the claims, and that the inventions claimed in the patent will now be allowed. The court acknowledges the authority cited by the plaintiffs for the proposition that the allowance of claims following reexamination strengthens the presumption of validity afforded to patent claims. *See, e.g., E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F.Supp. 1135, 1141 (D.Del.), *aff'd without op.,* 887 F.2d 1095, 1989 WL 108217 (Fed.Cir.1989);

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.,* 893 F.Supp. 508, 514 (D.Md. 1995), *aff'd,* 1996 WL 338388, 92 F.3d 1203 (Fed.Cir.1996). Nevertheless, the defendants have a substantial argument that the amended claims remain invalid for obviousness-type double patenting.

The amendment to claim 20 of the Re. '656 patent, the only independent claim and thus the claim upon which all of the others depend, simply adds a phrase limiting the claim to the administration of subantibacterial doses of tetracyclines. Among the claims in the '897 patent, the patent which was the basis for the PTO's double-patenting rejection of the Re. '656 patent, is a claim that recites a method "wherein the amount of the tetracycline administered is from 10–100% of the normal antibiotic therapeutic dose of the tetracycline." U.S. Patent No. 4,666,897 at 14:43–46, found at Scheibeler Decl., Ex. 11. A dose that is from 10–100% of the normal antibiotic dose would seem to encompass doses deemed to be subantibacterial as claimed in the amended claim 20 of Re. '656 patent. If so, then the amendment that adds the above limitation to claim 20 adds no patentable distinction to the method of treatment disclosed in the '897 patent, and the Re. '656 patent would appear to remain invalid for obviousness-type double-patenting over that '897 patent. At the very least, this argument appears to the court to possess substantial merit, and thus provides an additional reason to deny the issuance of preliminary relief.

### 2. Irreparable Harm

The plaintiffs cite a host of harms they will suffer if preliminary relief is not granted, most of which emanate from an expected sharp drop in revenue. Sales of Periostat® have produced over 80% of CollaGenex's gross revenues in the last three years and CollaGenex projects that

it will likely lose 90% of its revenues from Periostat® within a year after generic substitutes are introduced. This loss in revenue would mean that CollaGenex would never recoup its investment in Periostat® and would have to curtail its research and development of other drugs. CollaGenex contends that the impact would be so drastic that it would face the destruction of its entire business with the attendant loss of jobs. The need for a preliminary injunction is particularly acute, they argue, because of their settlement with Mutual. The terms of the settlement bestow upon Mutual an irrevocable, royalty-free license to manufacture and sell its own generic form of Periostat® if any generic form of the drug is offered for sale for a specified number of consecutive business days by any other manufacturer.[6] Thus, if the defendants here obtain FDA approval and begin offering their generics for sale, then even if they are later held to have infringed and are enjoined from selling their generic forms of the drug, Mutual would nevertheless be able to market its generic form of Periostat® without paying the royalty they are now required to pay.

The court is not persuaded that the financial hardships catalogued by CollaGenex amount to irreparable harm. As an initial matter, because the plaintiffs have not made a clear showing of success on the merits with respect to their infringement claim, they are not entitled to a presumption of irreparable harm. *Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed.Cir.1996) (citing *High Tech Medical Instrumentation v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir.1995)). Moreover, financial loss is not of itself sufficient to establish irreparable harm, particularly when the defendants are apparently financially capable of satisfying any judgment if they are held to have infringed. *See Eli Lilly and Co.*, 82 F.3d at 1578. Calculating the plaintiffs' lost profits if they prevail would not appear to be particularly difficult since that could be determined based on the defendants' sales of generic forms of Periostat®, matters susceptible of fairly simple ascertainment and proof. Nor is the loss of resources for the development of other drugs sufficient to constitute irreparable harm. *Id.*

Although the loss of an entire business has been held to constitute irreparable harm, at least in non-patent cases, *see, e.g., Roso–Lino Beverage Distrib., Inc. v. Coca–Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2nd Cir.1984); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir.1970), the plaintiffs have not sustained their burden on this point. First, a substantial portion of the projected loss in revenue leading to the supposed loss of CollaGenex's entire business would be the result of the plaintiffs' own decision to bargain away its patent rights to Mutual. As detailed earlier, a rather unusual feature of the settlement of CollaGenex's claims of infringement against Mutual included the granting of an irrevocable, royalty-free license to sell its generic form of Periostat® once any other drug company offered a generic form of Periostat® for sale for a certain number of consecutive business days. CollaGenex's decision to bargain away its exclusive patent rights in that manner was the product of a business decision that reflected an assessment of the various other benefits CollaGenex received from the transaction. Having obtained a bargained for benefit by giving up its rights on those terms, the

---

**6.** The number of days is set forth in a sealed submission to the court which was available only to the parties and the court.

court questions whether any financial harm to CollaGenex that may result from that transaction should be considered by the court at all in assessing irreparable harm.

A separate, and equally troublesome feature of the plaintiffs' destruction of business argument is that CollaGenex has made no such catastrophic predictions in the disclosure statements it has filed with the Securities and Exchange Commission. In a Form 8–K filed with the SEC for the purpose of disclosing the court's decision dissolving the injunction that was the last impediment to approval and marketing of the defendants' generic forms of Periostat®, CollaGenex makes no prediction whatsoever that its viability as a going concern is in danger. *See* CollaGenex Pharmaceuticals, Inc. Form 8–K, Jan. 20, 2005, annexed to Mentlik Decl., Ex. P. Nor does a simultaneously issued press release, incorporated by reference in the Form 8–K. *See* Mentlik Decl., Ex. Q. Although previously filed Forms 10–K and 10–Q state that CollaGenex's business would be "materially adversely affected" if generic forms of Periostat® entered the market, none of them suggest consequences as dire as the complete destruction of CollaGenex's business.[7] *See* Mentlik Decl., Ex. A at 26–27; Ex. R at 26–27; Ex. S at 29–30; Ex. T at 21–22. The failure to disclose that its viability as a going concern is threatened by FDA approval of generic competition, particularly in the Form 8–K filed immediately after the preliminary injunction was dissolved, undercuts CollaGenex's argument that such a drastic result will follow.

**7.** In SEC parlance, a "material adverse event" may include an event which causes as little as a 5% decrease in revenue. *See generally* Staff Accounting Bulletin No. 99, Securities and Exchange Commission, *codified at* 17 C.F.R. Pt. 211, Subpart B, 64 F.R. 45150–01 (Aug. 19, 1999), 1999 WL 625156 (F.R.). Thus, a statement that one's business would be "materially adversely affected" does not suggest the business is in serious danger of failing.

### 3. Balance of Hardships

■ Although the court need not consider the balance of hardships or the public interest once it decides that a movant has failed to establish either likelihood of success or irreparable harm, this factor favors the plaintiffs. Clearly the loss of exclusivity will affect its income substantially, at least in the short term, if a preliminary injunction is not granted. Not only will it lose market share, but it will also have to compete on price and its profit per does will be reduced as well. The loss of this revenue stream will in turn affect its ability to develop other products. Thus, although a judgment will compensate the plaintiffs for the lost income, they will have lost valuable time in the development of other revenue-producing products. On the other hand, if a preliminary injunction is granted, the defendants will lose at most the revenue stream they would earn before the Re. '656 patent expires in May 2007, a financial hardship which can be ameliorated by the requirement of a bond. There is no indication that the defendants would suffer any adverse impact on other aspects of their business. Because they sell generic drugs, and do not develop new drugs like CollaGenex, the loss of revenue does not affect any research and development efforts like those engaged in by CollaGenex. Accordingly, the balance of hardships tips in favor of the plaintiffs.

### 4. The Public Interest

■ On the other hand, the public interest mitigates against granting preliminary relief in this case. Although the public has an interest in protecting the exclusivity

rights afforded by the patent system and thus encouraging innovation and invention, that interest is not damaged if preliminary relief is not granted. A judgment awarding damages against the infringing party and in favor of the patent holder is sufficient to protect that interest. On the other hand, the public has a strong interest in obtaining generic drugs at the reduced rates that they are offered. *See Boehringer Ingelheim Corp. v. Shalala,* 993 F.Supp. 1, 3 (D.D.C.1997). This strong public interest has been recognized in the enactment of the Hatch–Waxman Amendments, *see* note 2 *supra,* whose principal purpose was "to increase competition in the drug industry by facilitating the approval of generic copies of drugs." *Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1326, 332 U.S.App. D.C. 407, 420 (D.C.Cir.1998) (quoting *Mead Johnson Pharmaceutical Group, Mead Johnson & Co. v. Bowen,* 838 F.2d 1332, 1333, 267 U.S.App.D.C. 382, 383 (D.C.Cir.1988)). "Congress expected that competition 'to make available more low cost generic drugs.'" *Id.* (citing H.R.Rep. No. 98–857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647). The public interest is heightened in this case because the users of Periostat® tend to be the elderly, on fixed incomes, who would benefit from the lower prices engendered by the appearance of generic competition. For these reasons, the public interest favors denial of the motion for preliminary relief.

### III. CONCLUSION

The plaintiffs have not met their burden of establishing a reasonable likelihood of success on the merits and irreparable harm, both of which are essential prerequisites for the preliminary relief they seek. *Amazon.com, Inc.,* 239 F.3d at 1350. I therefore recommend that the plaintiffs' motions for a temporary restraining order and for preliminary injunctive relief be DENIED.

\* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *see, e.g., Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).